UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BLOCK SCIENTIFIC, INC.,<br><br>                              Plaintiff,<br><br>v.<br><br>TRUE DIAGNOSTICS, INC.;<br>SYNTRON BIORESEARCH, INC.; and<br>DOES 1-100, inclusive,<br><br>                              Defendants. | Case No.: 21-CV-1118 JLS (JLB)<br><br>**ORDER (1) GRANTING DEFENDANTS' REQUEST FOR JUDICIAL NOTICE, AND (2) GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS**<br><br>(ECF No. 7) |

      Presently before the Court is Defendants True Diagnostics, Inc. ("True Diagnostics") and Syntron Bioresearch, Inc.'s ("Syntron," collectively "Defendants") Motion to Dismiss ("Mot.," ECF No. 7), as well as Defendants' Request for Judicial Notice in support of the same ("RJN," ECF No. 7-2). Plaintiff Block Scientific, Inc. filed an Opposition to the Motion ("Opp'n," ECF No. 11), and Defendants filed a Reply in support of the Motion ("Reply," ECF No. 13). The Court decides the matter on the papers submitted and without oral argument pursuant to Civil Local Rule 7.1(d)(1). *See generally* ECF No. 12. Having carefully reviewed Plaintiff's Complaint ("Compl.," ECF No. 1), the Parties' arguments, and the relevant law, the Court **GRANTS** Defendants' RJN and **GRANTS IN PART** and **DENIES IN PART** Defendants' Motion to Dismiss, as set forth below.

# BACKGROUND[1]

Plaintiff supplies clinical laboratory equipment to hospitals, educational institutions, and other organizations. Compl. ¶ 8. Defendants research, develop, and manufacture diagnostic test systems and detection readers. *Id.* ¶¶ 9–10. In March 2020, Defendants developed a test kit to identify IgG and IgM antibodies to the novel coronavirus 2019-nCoV ("COVID-19") in human serum, plasma, or whole blood (the "QuikPac Test"). *Id.* ¶ 12. Plaintiff alleges Defendants represented that the QuikPac Test was highly effective at detecting COVID-19 antibodies and would far exceed a 90% IgG positive percent agreement ("PPA") sensitivity and specificity. *See id.* ¶ 13. Additionally, Plaintiff claims that Defendants represented that they would abide by all requirements set by the United States Food and Drug Administration ("FDA") for serology testing, including obtaining all applicable authorizations and approvals. *Id.*

In April 2020, Plaintiff negotiated and executed a Manufacturing Supply Agreement (the "Agreement") with Defendants for the manufacture and sale of QuikPac Tests, which Plaintiff planned to distribute to its customers in the United States. *Id.* ¶ 14. Plaintiff subsequently entered multiple contracts with its customers for the sale of QuikPac Tests. *Id.* ¶ 16. Plaintiff alleges that Defendants knew about the agreements with Plaintiff's customers and that these agreements were worth millions of dollars in sales to Plaintiff. *Id.*

Plaintiff claims that Defendants failed to deliver the QuikPac Tests on time, altered production timelines, missed production schedules, and failed to properly communicate delays. *Id.* ¶ 21. Plaintiff alleges Defendants' failure to timely deliver the QuikPac Tests resulted in Plaintiff losing customers. *Id.* Additionally, Plaintiff claims that Defendants failed to properly submit the QuikPac Test for Emergency Use Authorization ("EUA") through the FDA. *Id.* ¶ 22. Defendants allegedly submitted the EUA request for the QuikPac Test through their third-party component supplier, Tianjin New Bay Bioresearch

---

[1] The facts alleged in Plaintiff's Complaint are accepted as true for purposes of the present Motion. *See Vasquez v. Los Angeles Cty.*, 487 F.3d 1246, 1249 (9th Cir. 2007) (holding that, in ruling on a motion to dismiss, the Court must "accept all material allegations of fact as true").

Co. ("Tianjin"), a Chinese company. *Id.* Plaintiff claims this is contrary to an FDA specification that requires the manufacturer or developer of the applicable serology test to submit the EUA request itself. *Id.* Finally, in July 2020, the QuikPac Test failed a serology test evaluation, scoring an IgG PPA sensitivity of only 73.3%, which was below the 90% required for EUA and below the IgG PPA sensitivity guaranteed by Defendants. *See id.* ¶ 25. As a result of these issues, Plaintiff claims its customers cancelled their orders and requested full refunds. *Id.* ¶¶ 23, 26.

Plaintiff filed suit for breach of contract, intentional interference with contractual relations, intentional interference with prospective economic relations, and negligent interference with prospective economic relations. *See generally* Compl. On August 17, 2021, Defendants filed the present Motion to Dismiss Plaintiff's Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). *See* ECF No. 7.

## REQUEST FOR JUDICIAL NOTICE

As an initial matter, Defendants request that the Court take judicial notice of the Manufacturing Supply Agreement between the Parties and three FDA guidance documents related to COVID-19 serology tests. *See generally* RJN. Plaintiff does not oppose Defendants' request.

As a general rule, a district court cannot rely on evidence outside the pleadings in ruling on a Rule 12(b)(6) motion without converting the motion into a Rule 56 motion for summary judgment. *See United States v. Ritchie*, 342 F.3d 903, 907 (9th Cir. 2003) (citing Fed. R. Civ. P. 12(b); *Parrino v. FHP, Inc.*, 146 F.3d 699, 706 n.4 (9th Cir. 1998)). "A court may, however, consider certain materials—documents attached to the complaint, documents incorporated by reference in the complaint, or matters of judicial notice—without converting the motion to dismiss into a motion for summary judgment." *Id.* at 908 (citing *Van Buskirk v. CNN*, 284 F.3d 977, 980 (9th Cir. 2002); *Barron v. Reich*, 13 F.3d 1370, 1377 (9th Cir. 1994); 2 James Wm. Moore et al., Moore's Federal Practice § 12.34[2] (3d ed. 1999)). Additionally, the Court may take judicial notice of "[p]ublic records and government documents available from reliable sources on the Internet," such as materials

available on government agency websites. *Hansen Beverage Co. v. Innovation Ventures, LLC*, No. 08-CV-1166-IEG POR, 2009 WL 6597891, at *2 (S.D. Cal. Dec. 23, 2009) (quoting *United States ex rel. Dingle v. BioPort Corp.*, 270 F. Supp. 2d 968, 972 (W.D. Mich. 2003)); *see also Daniels–Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 999 (9th Cir. 2010) (taking judicial notice of information made publicly available on the websites of government entities when neither party disputes the authenticity of the information).

Plaintiff's claims depend on the terms of the Agreement and the FDA guidance. Additionally, both Parties relied to a significant extent on the Agreement in their briefing on the Motion. The Court therefore takes judicial notice of the Agreement and the FDA guidance documents available on a reliable government website in ruling on the present Motion. Accordingly, the Court **GRANTS** Defendants' Request for Judicial Notice.

## LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) permits a party to raise by motion the defense that the complaint "fail[s] to state a claim upon which relief can be granted," generally referred to as a motion to dismiss. The Court evaluates whether a complaint states a cognizable legal theory and sufficient facts in light of Federal Rule of Civil Procedure 8(a), which requires a "short and plain statement of the claim showing that the pleader is entitled to relief." Although Rule 8 "does not require 'detailed factual allegations,' . . . it [does] demand more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). In other words, "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). A complaint will not suffice "if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal*, 556 U.S. at 677 (citing *Twombly*, 550 U.S. at 557).

To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting

*Twombly*, 550 U.S. at 570); *see also* Fed. R. Civ. P. 12(b)(6).  A claim is facially plausible when the facts pled "allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 677 (citing *Twombly*, 550 U.S. at 556).  That is not to say that the claim must be probable, but there must be "more than a sheer possibility that a defendant has acted unlawfully." *Id.*  Facts "'merely consistent with' a defendant's liability" fall short of a plausible entitlement to relief. *Id.* (quoting *Twombly*, 550 U.S. at 557).  This review requires context-specific analysis involving the Court's "judicial experience and common sense." *Id.* at 675 (citation omitted).  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Id.*

Where a complaint does not survive 12(b)(6) analysis, the Court will grant leave to amend unless it determines that no modified contention "consistent with the challenged pleading . . . [will] cure the deficiency." *DeSoto v. Yellow Freight Sys., Inc.*, 957 F.2d 655, 658 (9th Cir. 1992) (quoting *Schreiber Distrib. Co. v. Serv-Well Furniture Co.*, 806 F.2d 1393, 1401 (9th Cir. 1986)).

## ANALYSIS

Defendants move to dismiss Plaintiff's breach of contract claim and interference claims for failure to state a claim.  The Court will first address the sufficiency of Plaintiff's breach of contract claim, then Plaintiff's interference claims.

### I. Breach of Contract Claim

Defendants move to dismiss Plaintiff's cause of action for breach of contract.  *See generally* Mot. at 11–19.  Specifically, Defendants argue that Plaintiff's allegations are insufficient to state a plausible breach of contract claim because (1) Plaintiff's allegations are inconsistent with the actual language of the Agreement and the FDA regulations on which Plaintiff relies, *see id.* at 12; and (2) Plaintiff fails to allege specific facts as to how Defendants did not use commercially reasonable efforts to abide by timelines, *id.* at 17–18. *Id.*

"[T]he elements of a cause of action for breach of contract are (1) the existence of the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages to the plaintiff." *Oasis W. Realty, LLC v. Goldman*, 51 Cal. 4th 811, 821 (2011) (citing *Reichert v. Gen. Ins. Co.*, 68 Cal. 2d 822, 830 (1968)). Plaintiff adequately alleges the existence of the contract, *see* Compl. ¶ 29, and performance, *see id.* ¶ 30. Based on the Parties' competing interpretations of the Agreement and the relevant FDA regulations, however, the Parties dispute whether the Complaint alleges a breach. Plaintiff has three theories to sustain its breach of contract claim: (1) the QuikPac Tests were less effective than Defendants represented, which led to Defendants' failure to attain EUA for the QuikPac Tests, Compl. ¶¶ 33–34; (2) Defendants used a third party to submit their EUA request, *id.* ¶¶ 32, 34; and (3) Defendants failed to use commercially reasonable efforts to timely deliver the QuikPac Tests, *id.* ¶ 34. The Court will examine the sufficiency of Plaintiff's allegations under each theory to determine whether Plaintiff has stated a claim for breach of contract.

### A.  *Failure to Attain EUA*

Plaintiff alleges that Defendants represented prior to entering the Agreement "that the QuikPac Test was highly effective and would far exceed a 90% IgG PPA sensitivity and specificity." Compl. ¶ 13. In July 2020, however, "the QuikPac Test failed a serology test evaluation, scoring an IgG PPA/sensitivity of only 73.3%, far below the 90% required for FDA EUA." *Id.* ¶ 25. Plaintiff alleges that Defendants represented that their execution, delivery, and performance under the Agreement would not violate or conflict with any applicable law. Compl. ¶ 31; *see also* ECF No. 7-1, Ex. 1 ("Agreement") § 8.2(e). Plaintiff argues that Defendants' failure to attain EUA for the QuikPac Tests amounted to a failure to "obtain all material authorizations, approvals, and consents required to perform their obligations under the Agreement." Opp'n at 11.

The Agreement contains various representations and warranties by Defendants, including representations and warranties that:

///

> (e) the execution, delivery and performance of this Agreement by the Suppliers will not violate, conflict with, require consent under or result in any breach or default under (i) any of either of Suppliers' organizational documents, (ii) any applicable Law or (iii) with or without notice or lapse of time or both, the provisions of any material contract of which either Supplier is a party.
>
> . . .
>
> (g) it is in material compliance with all applicable Laws and contracts of which either Supplier is a party relating to this Agreement, the Goods and the operation of its business; and
>
> (h) it has obtained all material licenses, authorizations, approvals, consents or permits required by applicable Laws to conduct its business generally and to perform its obligations under this Agreement.

Agreement § 8.2.

Defendants argue that Plaintiff's allegations are insufficient to state a claim for breach of contract because Defendants' representations pursuant to Provisions 8.2(g) and (h) "were current representations about [Defendants'] conduct and did not extend to future compliance with not-yet-promulgated FDA recommendations or obtaining licenses pursuant to procedures not yet in effect at the time of executing the Supply Agreement." Mot. at 13. Furthermore, Defendants argue that the FDA policy documents are not "law" within the meaning of the Agreement, but instead "are merely self-proclaimed 'guidance' that at the time of executing the Supply Agreement authorized manufacturers to commercialize products without first obtaining an EUA." *Id.* at 14.

In response, Plaintiff contends that Defendants breached Provisions 8.2(g) and (h) of the Agreement. *See* Opp'n at 12. Plaintiff argues that Defendants were not in compliance with the Federal Food, Drug, and Cosmetic Act ("FDCA") at the time the Parties entered the Agreement because the QuikPac Test is a regulated "device" under the FDCA. Opp'n at 12. Although the FDA elected to utilize its "enforcement discretion" at the time of the Agreement due to the public health emergency, Plaintiff claims that the

QuikPac Tests still required FDA authorization or approval. *See id.* Plaintiff concedes that "the Agreement does not specifically require the QuikPac Tests to receive EUA"; however, Plaintiff alleges that the Parties agreed that Plaintiff wished to distribute the QuikPac Tests in the United States. *Id.* at 13. In order for Plaintiff to do so lawfully, Plaintiff claims the QuikPac Tests must have attained EUA under the FDA's COVID-19 guidelines. *Id.*

In a public emergency, section 564 of the FDCA empowers the FDA to authorize the sale of a device that is unapproved, unlicensed, or not cleared for commercial distribution. 21 U.S.C. § 360bbb-3. In February 2020, the United States Department of Health and Human Services ("HHS") declared a public health emergency and instructed the FDA to, among other things, grant EUAs for medical devices to combat the COVID-19 pandemic. *See* Declaration Under the Public Readiness and Emergency Preparedness Act for Medical Countermeasures Against COVID-19, 85 Fed. Reg. 7316-01, 7316-17 (2020).

On March 16, 2020, the FDA issued the FDA Policy for Diagnostic Tests for Coronavirus Disease-2019 During the Public Health Emergency ("FDA Guidance"). Ex. 1 (ECF No. 7-2). Pursuant to the FDA Guidance, which was in effect when the Parties executed the Agreement on April 15, 2020, testing developers and manufacturers like Defendants were authorized to commercialize COVID-19 tests without first obtaining EUA. *Id.* at 9. Although the FDA Guidance "encourage[d]" developers and manufacturers to submit their tests for EUA, the FDA Guidance provided that the "FDA does not intend to object to the development and distribution by commercial manufacturers or development and use by laboratories of serology tests to identify antibodies to SARS-CoV-2, where the test has been validated, notification is provided to FDA, and" certain information is provided to the FDA. *Id.*

In another FDA document, the FDA explicitly provided that under the FDA Guidance, the "FDA provided flexibility for serology tests to be marketed with notification to FDA and certain labeling information, but without submission of an EUA." Ex. 2 (ECF No. 7-2) at 7. It was in the subsequently enacted Policy for Coronavirus Disease-2019

Tests During the Public Health Emergency (Revised) ("Revised FDA Guidance"), effective May 11, 2020, that the FDA only allowed commercial manufacturers to develop and distribute serology tests like the QuikPac Test for a limited period of time "while an EUA is being prepared for submission to FDA." Ex. 2 at 7. Therefore, although COVID-19 tests like the QuikPac Test did not need EUA under the FDA Guidance in force when the Parties entered the Agreement, under a subsequent revision to the policy, EUA was required to sell tests commercially. *See id.* However, serology tests like the QuikPac Test still did not require EUA under the Revised FDA Guidance if they were used in laboratories, that is, not sold commercially to the public. *Id.*

As an initial matter, Defendants argue that the FDA Guidance is not "law" within the meaning of the Agreement, and therefore a failure to comply with the FDA Guidance or Revised FDA Guidance is not a failure to comply with "all applicable Laws." *Id.* at 14. The Court agrees with Defendants that the FDA Guidance and Revised FDA Guidance do not, themselves, qualify as "law" under the Agreement. Through the FDA Modernization Act of 1997, Congress authorized the FDA to issue guidance documents. Pub. L. No. 105-115, § 405, 111 Stat. 2296, 2368–69 (codified as amended at 21 U.S.C. § 371(h)). The Act empowers the FDA to "develop guidance documents with public participation," subject to the limitation that such guidance documents "shall not create or confer any rights for or on any person." 21 U.S.C. § 371(h)(1)(A). Indeed, every page of the FDA Guidance contains a bold, italicized header that announces the document "Contains Nonbinding Recommendations." *See generally* Ex. 1. Furthermore, the introduction to the FDA Guidance states that the policy "does not establish any rights for any person and is not binding on FDA or the public." *Id.* at 9; *see also* 21 C.F.R. § 10.115(d) ("Guidance documents do not establish legally enforceable rights or responsibilities. They do not legally bind the public or FDA."). The guidance documents "describe the Agency's current thinking on a topic and should be viewed only as recommendations[.]" FDA Guidance at 2. Therefore, the Court agrees with Defendants that the FDA Guidance does not constitute "law."

Underlying the FDA Guidance and Revised FDA Guidance, however, are statutory and regulatory requirements for medical devices like COVID-19 tests. Defendants represented they were in compliance with such laws at the time the Parties entered the Agreement, *see* Agreement § 8.2(g); however, Plaintiff argues that Defendants breached section 8.2(g) because even though the FDA utilized its enforcement discretion to allow the sale and marketing of COVID-19 tests without first receiving EUA, Plaintiff claims EUA was still required. Opp'n at 12. Although the FDA's regulation of COVID-19 serology tests in early 2020 is not a picture of clarity given the rapidly developing situation with the pandemic, the Court finds Plaintiff's argument unavailing. Pursuant to section 564 of the FDCA, the FDA can authorize the sale of a medical device that is unapproved, unlicensed, or not cleared for commercial distribution in an emergency, such as the COVID-19 pandemic. *See* 21 U.S.C. § 360bbb-3. Such was the case in March 2020 when the Parties entered the Agreement. The FDA issued an "umbrella EUA" for "certain in vitro diagnostic SARS-CoV-2 Antibody Tests." Ex. 3 at 42. As explained in the FDA Guidance in force at the time the Parties entered the Agreement, manufacturers like Defendants did not need to attain EUA to develop or commercially distribute COVID-19 serology tests like the QuikPac Tests because the FDA had elected to exercise enforcement discretion. *See* FDA Guidance. Therefore, Defendants did not breach section 8.2(g) of the Agreement for their failure to attain EUA at the time the Parties entered the Agreement because Defendants were in material compliance with all FDA requirements at that time.

Similarly, the subsequent revision to the FDA Guidance did not cause Defendants to breach section 8.2(e) of the Agreement by failing to attain EUA. The Revised FDA Guidance required EUA for medical devices like the QuikPac Tests to be sold *commercially* in the United States; however, the FDA continued to not require EUA for certain uses of serology tests, such as in laboratories. The Parties' Agreement does not state that Defendants were required to attain EUA for the QuikPac Tests or specify that the tests must be fit for commercial sale in the United States. *See generally* Agreement. Furthermore, the Agreement does not specify that the tests need to meet or exceed certain

levels of PPA sensitivity and specificity, such as the threshold required to attain EUA. Therefore, whether Plaintiff has sufficiently alleged a claim for breach of contract for Defendants' failure to attain EUA depends on whether the Court may look outside the Parties' Agreement.

The Agreement contains an integration clause, which states that "this Agreement . . . constitutes the sole and entire agreement of the Parties with respect to the subject matter contained herein and therein, and supersedes all prior and contemporaneous understandings, agreements, representations and warranties, both written and oral, with respect to such subject matter." Agreement § 16.4. In the same vein, the outset of the Agreement states that

> any additional, contrary or different terms contained in any Purchase Order or other request or communication by Buyer pertaining to the sale of Goods by True Diagnostics, and any attempt to modify, supersede, supplement or otherwise alter this Agreement, will not modify this Agreement or be binding on the Parties unless such terms have been fully approved in a signed writing by authorized Representatives of both Parties.

Agreement § 1.2.

The parol evidence rule "prohibits the introduction of extrinsic evidence, whether oral or written, to vary the terms of an integrated written agreement or to add terms to an integrated agreement that is also intended as a complete and exclusive statement of the parties' agreement." *Pac. State Bank v. Greene*, 1 Cal. Rptr. 3d 739, 745 (Cal. Ct. App. 2003). California codifies its parol evidence rule in its Code of Civil Procedure § 1856. However, the California parol evidence rule does not "render inadmissible proof of contemporaneous oral agreements collateral to, and not inconsistent with, a written contract where the latter is either incomplete or silent on the subject, and the circumstances justify an inference that it was not intended to constitute a final inclusive statement of the transaction." *Ellis v. Klaff*, 216 P.2d 15, 19 (1950). Accordingly, the Parties' inclusion of an integration clause in the Agreement is but one factor in the Court's analysis. *See Enrico*

///

*Farms, Inc. v. H.J. Heinz Co.*, 629 F.2d 1304, 1306 (9th Cir. 1980) (per curiam) (citing *Masterson v. Sine*, 436 P.2d 561 (1968)).

The Agreement specifies that the Defendants will manufacture the QuikPac Tests "in compliance with the specifications . . . set forth in Schedule 2." Agreement § 8.3. However, Schedule 2 is blank. *See id.* at 32. In the Complaint, Plaintiff alleges that Defendants represented "that the QuikPac Test was highly effective and would far exceed a 90% IgG PPA sensitivity and specificity." Compl. ¶ 13. Plaintiff also claims that Defendants "repeatedly guaranteed" this level of sensitivity and specificity. *Id.* ¶ 25. The 90% IgG PPA sensitivity and specificity is also the threshold to qualify for EUA, and Plaintiff has alleged that Defendants were aware of Plaintiff's plans to sell the QuikPac tests commercially in the United States. There is no conflict between the alleged extrinsic representations by Defendants and the final written Agreement because the Agreement contains no specifications about the sensitivity and specificity of the QuikPac Tests. *See* Cal. Civ. Proc. Code § 1856(a)–(b) (stating parol evidence is not admissible to supply terms which are inconsistent with the written agreement); *see also Shimmon v. Moore*, 104 Cal. App. 2d 554, 559 (1951) ("Where parol evidence explains and does not vary the written contract, it may be admitted." (citing *White v. Ardzrooni*, 71 Cal. App. 393 (1925))).

The Court finds that Plaintiff may rely on extrinsic evidence to supply the agreed upon specifications of the QuikPac Tests, a term on which the Agreement is silent. As Plaintiff has alleged that Defendants represented the QuikPac tests would exceed 90% IgG PPA sensitivity and specificity and that Defendants would secure EUA, but failed to do so, Plaintiff has sufficiently stated a claim for breach of contract. Accordingly, the Court **DENIES** Defendants' Motion to Dismiss as to Plaintiff's allegations that the QuikPac Test was less effective than Defendants represented, and Defendants failed to attain EUA.

### B.     *Improper EUA Submission*

In the Complaint, Plaintiff alleges that Defendants breached the Agreement by "fail[ing] to properly submit the QuikPac Test for Emergency Use Authorization ("EUA"), as required by the FDA to legally market and sell the QuikPac Test in the United States."

Compl. ¶ 22. Plaintiff claims that Defendants' third-party supplier Tianjin submitted the EUA on Syntron's behalf. *Id.* Plaintiff claims that Defendants assured Plaintiff that they would request a name change with the FDA but failed to do so. *Id.*

Defendants argue that the FDA Guidance did not preclude EUA submission through a third party. Mot. at 14. The FDA Guidance "recommend[s]" that "manufacturers submit a completed EUA request within 15 business days of the initial communication to FDA that the assay has been successfully validated." FDA Guidance at 8. As the Court has already found that EUA was not required by law, it does not follow that failure to submit an EUA request through the manufacturer can sustain a claim for breach of contract. Even overlooking this issue, Plaintiff has not cited any statute or regulation requiring EUA submission through the device manufacturer. Additionally, it is not clear from the guidance that Defendants were required to submit the EUA request themselves. Although the FDA Guidance does use the word "manufacturer," the Public Readiness and Emergency Preparedness Act ("PREP Act") defines the term "manufacturer" to include "a contractor or subcontractor of a manufacturer;" "a supplier or licenser of any product, intellectual property, service, research tool, or component or other article used in the design, development, clinical testing, investigation, or manufacturing of a covered countermeasure;" and "any or all of the parents, subsidiaries, affiliates, successors, and assigns of a manufacturer." 42 U.S.C. § 247d-6d(i)(4). In the Complaint, Plaintiff describes Tianjin as a "third-party supplier of components for the [QuikPac Test]." Compl. ¶ 32. Therefore, it appears that Tianjin is a "supplier or licenser of any product" within the meaning of "manufacturer" in the PREP Act. In the absence of authority stating otherwise, the Court finds that Tianjin was permitted by statute to submit the EUA on Defendants' behalf.

Therefore, the Court **GRANTS** Defendants' Motion to Dismiss as to Plaintiff's claim for breach of contract that Defendants failed to properly submit the QuikPac Tests for EUA.

///

### C.     *Untimely Delivery*

Defendants argue that Plaintiff cannot state a claim based on its allegations that Defendants failed to use commercially reasonable efforts to timely deliver the QuikPac Tests and abide by production schedules because the claim is contradicted by the explicit terms of the Parties' Agreement. Mot. at 17 (citing Compl. ¶ 34). In response, Plaintiff argues that its allegations are sufficient to put Defendants on reasonable notice of the claim against them. Opp'n at 14 (quoting *Qingdao Tang-Buy Int'l Imp. & Exp. Co. v. Preferred Secured Agents, Inc.*, No. 15-cv-00624-LB, 2016 WL 6524396, at *4 (N.D. Cal. Nov. 3, 2016)).

The Parties' Agreement states that "[a]ny time quoted for delivery" of the QuikPac Tests "is an estimate only[.]" Agreement § 4.5. However, the Agreement required Defendants to "use commercially reasonable efforts to deliver all Goods on or before the Requested Delivery Date." *Id.* In the Complaint, Plaintiff alleges that Defendants "continuously failed to deliver QuikPac Tests on time, altered production timelines and missed production schedules, and failed to properly communicate delays." Compl. ¶ 21. Plaintiff also alleges that Defendants "fail[ed] to use commercially reasonable efforts to timely deliver QuikPac Tests to Block Scientific and its Customers." *Id.* ¶ 34.

The Agreement does not provide for a specific delivery date, only that Defendants will use "commercially reasonable efforts" to deliver the QuikPac Tests on or before the date Plaintiff requests. *See* Agreement § 4.5. Plaintiff's conclusory allegations that Defendants did not use commercially reasonable efforts to timely deliver the QuikPac Tests is insufficient to state a claim. This case is distinguishable from *Qingdao*, upon which Plaintiff relies. The court in *Qingdao* found the case was about "fairly defined shipments" with two specifically defined delivery periods: "the 2013 holiday season" and "the 2014 spring/summer season." *Qingdao Tang-Buy Int'l Imp. & Exp. Co.*, 2016 WL 6524396, at *4. Such is not the case here. The Agreement does not require Defendants to deliver the QuikPac Tests by a certain date and instead explicitly provides that "[a]ny time quoted for delivery is an estimate only[.]" Agreement § 4.5. Plaintiff has not specifically alleged how

Defendants failed to use commercially reasonable efforts to deliver the QuikPac Tests on Plaintiff's requested date. *See Levy v. State Farm Mut. Auto. Ins. Co.*, 150 Cal. App. 4th 1, 5 (2007) ("Facts alleging a breach, like all essential elements of a breach of contract cause of action, must be pleaded with specificity."). These conclusory allegations are insufficient to sustain a cause of action for breach of contract.

Therefore, the Court **GRANTS** Defendants' Motion to Dismiss as to Plaintiff's claim for breach of contract that Defendants failed to timely deliver the QuikPac Tests.

## II.    Interference Claims

Defendants argue that Plaintiff's three interference claims must be dismissed because these causes of action are precluded by the Agreement's limitation of liability provision and the economic loss doctrine.[2] Mot. at 19–20. In response, Plaintiff argues that its interference claims survive because California Civil Code § 1668 renders the Agreement's limitation of liability provisions unenforceable. Opp'n at 15. Plaintiff does not address Defendants' economic loss doctrine argument. *See generally* Opp'n. Notwithstanding Plaintiff's failure to respond, the Court agrees that Plaintiff's interference claims are barred by the Agreement's limitation of liability provision and the economic loss doctrine for the following reasons.

### A.    *Limitation of Liability Provision*

Defendants argue that Plaintiff's intentional interference claims are barred by the Agreement's limitation of liability provision. Mot. at 19–20. Defendants argue that under California law, a limitation of liability provision is enforceable where a plaintiff is not alleging any conduct independent from the violation of a promise. *Id.* at 20. In response, Plaintiff argues that the Agreement's limitation of liability provision is unenforceable under California Civil Code section 1668 because Plaintiff has alleged willful or fraudulent

---

[2] Defendants also argue that Plaintiff's claim for intentional interference with prospective economic relations fails because Plaintiff has not alleged wrongful conduct. Mot. at 19. As the Court finds that this claim is barred by the limitation of liability provision and the economic loss doctrine, *see infra* Sections II.A–B, the Court declines to reach this argument.

conduct. *See* Opp'n at 15. Additionally, Plaintiff argues that the limitation of liability provision does not apply to Syntron, as it only names True Diagnostics. *Id.*

The Agreement's limitation of liability provision insulates "True Diagnostics or its representatives" from any "liability for consequential or indirect damages," including anything related to potential "lost profits or revenues" related to a breach of the Agreement. Agreement § 10.1. The limitation of liability provision states that Plaintiff "assume[d] all risk" associated with the QuikPac Tests, including with respect to their "general effectiveness, success or failure . . . regardless of any oral or written statements made by True Diagnostics . . . related to the use of the goods." *Id.* § 10.3.

The Limitation of Liability provision in full provides:

> 10.1 No Liability for Consequential or Indirect Damages. Except for obligations to make payment under this agreement, liability for indemnification, liability for breach of confidentiality, or liability for infringement or misappropriation of intellectual property rights, in no event shall True Diagnostics or its representatives be liable for consequential, indirect, incidental, special, exemplary, punitive or enhanced damages, lost profits or revenues or diminution in value, arising out of or relating to any breach of this agreement, regardless of (a) whether such damages were foreseeable, (b) whether or not buyer was advised of the possibility of such damages and (c) the legal or equitable theory (contract, tort or otherwise) upon which the claim is based, and notwithstanding the failure of any agreed or other remedy of its essential purpose.
>
> 10.2 Maximum Liability for Damages. In no event shall True Diagnostics' aggregate liability arising out of or related to this agreement, whether arising out of or related to breach of contract, tort (including negligence) or otherwise, exceed the total of the amounts paid to True Diagnostics pursuant to this agreement in the year period preceding the event giving rise to the claim.
>
> 10.3 Assumption of Risk. Without limiting the generality of the foregoing, buyer assumes all risk and liability for the results obtained by the use of any goods in the practice of any

>process, whether in terms of operating costs, general effectiveness, success or failure, and regardless of any oral or written statements made by True Diagnostics, by way of technical advice or otherwise, related to the use of the goods.

Agreement §§ 10.1–10.3 (emphasis omitted).

Plaintiff argues that courts find limitation of liability provisions like the one in the Agreement unenforceable pursuant to California Civil Code section 1668 to the extent the provision insulates defendants from fraud or willful injury. Opp'n at 15. Section 1668 provides: "All contracts which have for their object, directly or indirectly, to exempt anyone from responsibility for his own fraud . . . or violation of law, whether willful or negligent, are against the policy of the law." Cal. Civ. Code § 1668. Section 1668, therefore, renders the Agreement's limitation of liability unenforceable to the extent that it would insulate Defendants from liability for fraud or willful injury. *See WeBoost Media S.R.L. v. LookSmart Ltd.*, No. C 13–5304 SC, 2014 WL 2621465, at *9–10 (N.D. Cal. June 12, 2014).

Plaintiff argues that because its claim is for an intentional tort, the limitation of liability clause could not apply pursuant to section 1668. *See* Opp'n at 15. However, Plaintiff has not alleged that Defendants acted fraudulently, and Plaintiff has not satisfied the heightened pleading requirements of fraud here. *See BioResource, Inc. v. U.S. PharmaCo Distribution, Ltd.*, No. CV10–01053 SI, 2010 WL 3853025, at *3 (N.D. Cal. Sept. 29, 2010) ("While fraud and misrepresentation can constitute independently wrongful conduct to support a claim for intentional interference with prospective economic advantage, those allegations must satisfy Federal Rule of Civil Procedure 9(b)). Plaintiff appears to rely solely on the allegation that Defendants violated the law to argue that California Civil Code section 1668 invalidates the Agreement's limitation of liability provision. However, the Court has already found that Plaintiff has not adequately alleged that Defendants violated the law by failing to attain EUA or by submitting their EUA application through a third-party supplier. *See supra* Sections I.A–B. Therefore, section 1668 does not render the provision unenforceable. The provision insulates True

Diagnostics against Plaintiff's interference claims because the Agreement prohibits "liability for consequential or indirect damages," including anything related to potential "lost profits or revenues" related to a breach of the Agreement.  Agreement § 10.1.

Although the limitation of liability provision is enforceable, Plaintiff is correct that the provision explicitly limits the liability of only "True Diagnostics or its representatives," not Syntron. Opp'n at 15–16.  Defendants do not address this argument on reply and do not argue that Syntron is a "representative" of True Diagnostic's such that the provision would extend to Syntron.  *See generally* Reply.  Additionally, the Agreement does not support a finding that Syntron is a representative of True Diagnostics.  *See* Agreement Recitals at 1 (describing Syntron as "in the business of packaging products for use in the point-of-care markets" and True Diagnostics as "in the business of manufacturing and selling products for use in the point-of-care markets").  Therefore, although the limitation of liability provision shields True Diagnostics from Plaintiff's interference claims, it does not shield Syntron.  The Court will next examine whether the economic loss doctrine bars Plaintiff's interference claims against Syntron.

### B.  *Economic Loss Doctrine*

"Generally, purely economic losses are not recoverable in tort."  *NuCal Foods, Inc. v. Quality Egg LLC*, 918 F. Supp. 2d 1023, 1028 (E.D. Cal. 2013).  "The term 'economic loss' refers to damages that are solely monetary, as opposed to damages involving physical harm to person or property."  *Giles v. General Motors Acceptance Corp.*, 494 F.3d 865, 873 (9th Cir. 2007); *see also Robinson Helicopter Co., Inc. v. Dana Corp.*, 34 Cal. 4th 979, 988 (2004) (defining economic loss as "damages for inadequate value, costs of repair and replacement of the defective product or consequent loss of profits—without any claim of personal injury or damages to other property." (citations omitted)).  The economic loss doctrine "requires a purchaser to recover in contract for purely economic loss due to disappointed expectations, unless he can demonstrate harm above and beyond a broken contractual promise."  *Robinson*, 34 Cal. 4th at 988; *see also Erlich v. Menezes*, 21 Cal. 4th 543, 554 (1999) ("A breach of contract is tortious only when some independent duty

arising from tort law is violated."); *WeBoost Media S.R.L.*, 2014 WL 2621465, at *5 ("[T]he economic loss rule can still bar fraud and other intentional tort liability if those claims do not arise independently of the breach of contract claims.").

Here, Plaintiff's claims pertain to Defendants' alleged breach of the Agreement, and Plaintiff alleges it suffered purely economic losses. Plaintiff alleges Defendants' untimely delivery of the QuikPac Tests, failure to properly submit the QuikPac Test for EUA, and failure to attain EUA disrupted Plaintiff's contracts and economic relationships with third parties. Compl. ¶¶ 40, 48, 56. Additionally, Plaintiff alleges purely economic losses in its interference claims. Compl. ¶ 41 ("Customers cancelled their orders and demanded immediate refunds of monies paid to Block Scientific[.]"); *id.* ¶ 49 ("It was reasonably probable that the relationship between Block Scientific and its Customers would have yielded additional economic benefits[.]"); *id.* ¶ 57 ("Block Scientific lost all of the economic benefits reasonably expected from these relationships."). Furthermore, Plaintiff has not alleged some independent duty apart from the purported breach of contract that would render Defendants liable in tort. *See Erlich*, 21 Cal. 4th at 554.

Therefore, the Court finds Plaintiff's interference claims against Syntron are barred by the economic loss doctrine. As the Court previously found these claims barred against True Diagnostics pursuant to the Agreement's limitation of liability provision, *see supra* Section II.A, the Court **GRANTS** Defendants' Motion as to Plaintiff's intentional interference with contractual relations, intentional interference with prospective economic relations, and negligent interference with prospective economic relations claims.

## CONCLUSION

For the reasons stated above, the Court **GRANTS** Defendants' Request for Judicial Notice and **GRANTS IN PART** and **DENIES IN PART** Defendants' Motion to Dismiss (ECF No. 7). The Court **DISMISSES WITHOUT PREJUDICE** Plaintiff's claims for intentional interference with contractual relations, intentional interference with prospective economic relations claims, and negligent interference with prospective economic relations. To the extent Plaintiff's breach of contract claim is based on Defendants' purported failure

to timely deliver the QuikPac Tests or properly submit the QuikPac Test for EUA, the Court also **DISMISSES WITHOUT PREJUDICE** that claim. Plaintiff may file an amended complaint within <u>thirty (30) days</u> of the date on which this Order is electronically docketed. If Plaintiff fails to file an amended complaint, this action will proceed on Plaintiff's remaining claim.

      **IT IS SO ORDERED.**

Dated: February 16, 2022

*Janis L. Sammartino*
Hon. Janis L. Sammartino
United States District Judge